IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SAMEH WASSEFF,

                    Plaintiff,

        v.

THE NATIONAL INSTITUTE OF HEALTH,
et al.,

                    Defendants.

CIVIL ACTION
NO. 16-703

## OPINION

**Slomsky, J.**                                                    **February 6, 2017**

## I.        INTRODUCTION

Plaintiff Sameh Wasseff, proceeding pro se, brings this suit against Defendants the National Institute of Health, the Department of Health and Human Services, the University of Pennsylvania School of Medicine, and the Trustee of the University of Pennsylvania for alleged wrongdoing committed against him during his employment at the University of Pennsylvania.[1]

In Count I of the Third Amended Complaint ("TAC"), Plaintiff alleges a breach of contract claim against Penn Defendants.  In Count II, Plaintiff alleges a promissory estoppel claim against Penn Defendants.  In Count III, Plaintiff asserts that Penn Defendants discriminated against him based on his race and national origin, in violation of 42 U.S.C. § 1981. In Count IV, Plaintiff contends that Penn Defendants discriminated and retaliated against him based on his race and national origin in violation of Title VI of the Civil Rights Act of 1964

---

[1]  In this Opinion, the University of Pennsylvania School of Medicine and the Trustee of the University of Pennsylvania will be referred to as the "Penn Defendants."  The National Institute of Health and the Department of Health and Human Services will be referred to as the "Federal Defendants."

("Title VI").[2]   In Count V, Plaintiff alleges a breach of fiduciary duty claim against Penn Defendants.   In Count VI, Plaintiff brings a negligent supervision claim against Penn Defendants.  Finally, in Count VII, Plaintiff alleges a claim under the Administrative Procedures Act against Federal Defendants.  (Doc. No. 38.)  Defendants have filed two Motions to Dismiss the TAC in its entirety.  (Doc. Nos. 39, 40.)  The Motions are ripe for disposition.[3]

## II.     BACKGROUND[4]

In October 2006, the University of Pennsylvania ("Penn") hired Plaintiff Sameh Wasseff, a man of Egyptian citizenship, as a Postdoctoral Researcher.  (Doc. No. 38, Ex. A.)  Plaintiff was a trained and licensed medical doctor in Egypt before accepting the position at Penn and moving to Philadelphia, Pennsylvania.  (Doc. No. 38 at ¶¶ 1-3, 6.)

From October 2006 to November 2015, Plaintiff worked at Penn.  For the first five years of his employment, from October 2006 to October 2011, Plaintiff was employed as a Postdoctoral Researcher.  (Id. at ¶ 6.)  In this role, he assisted the University in conducting experiments to fulfill research grants it obtained.[5]  (Id. at ¶¶ 6, 11, 122.)  Plaintiff was originally hired to conduct research for Penn's Department of Neurology.  (Id. at ¶ 9.)  Plaintiff's faculty supervisor, Steven Scherer, requested that Plaintiff perform "patch-clamp" experiments on mice to determine "how astrocytes and oligodendrocytes are coupled by gap junctions."  (Doc. No. 38,

---

[2]  Title VI is codified at 42 U.S.C. § 2000d, et seq.

[3]  In reaching a decision, the Court has considered the TAC (Doc. No. 38), the Motions to Dismiss the TAC (Doc. Nos. 39, 40), and Plaintiff's Response in Opposition (Doc. Nos. 43, 44).

[4]  When analyzing the sufficiency of a pro se complaint, courts in this Circuit must liberally construe the pleading.  Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002).  The facts are taken from the TAC and are accepted as true for purposes of deciding the Motion to Dismiss.

[5]  The National Institute of Health ("NIH") and the Department of Health and Human Services ("HHS") funded these grant projects.  (Doc. No. 40 at 4.)

Ex. A.)  Plaintiff's experiments required "many steps" and "long working hours" to complete. (Id. at ¶¶ 13-14.)  Plaintiff's employment as a Postdoctoral Researcher was originally for a one-year term, and was eligible for renewal on an annual basis, for a maximum of five years.  (Doc. No. 38, Ex. A.)  Upon reaching the five-year point in October of 2011, Penn hired Plaintiff as a Research Associate.  (Id. at ¶¶ 93-94.)  This new position allowed Plaintiff to work on more aspects of the grant projects.  (Id. at ¶ 97.)  Plaintiff held the position as a Research Associate for four years, from November 1, 2011 through November 30, 2015.  (Id. at ¶ 122.)  Like his previous job as a Postdoctoral Researcher, his employment as a Research Associate was subject to renewal on an annual basis.

Plaintiff believed that accepting these jobs would eventually help him transition to a position as a resident or assistant professor with the University.  (Id. at ¶ 21.)  Plaintiff also thought that the offer letters he received, coupled with the University's policies, guaranteed him future benefits after completing his work as a Postdoctoral Researcher or Research Associate, such as securing future employment in different roles.  (Id. at ¶¶ 39-40, 133-41.)

Through a series of unfortunate events, however, Plaintiff never obtained a position as a resident or assistant professor with the University.  Shortly after Plaintiff was hired, he began having problems at work.  Plaintiff alleges that, during his tenure at Penn, he was subjected to negative treatment.  (Id. at ¶¶ 48-49, 64-65, 105-15.)  He believes his co-workers were routinely stalking him in the laboratory and were attempting to undermine his experiments.  (Id. at ¶¶ 103-04.)  For example, Plaintiff states that the "housekeeper . . . started to stalk me with menacing and threatening looks, flexing his muscles every time his sees me."[6]  (Id. at ¶ 76.)  Plaintiff

---

[6]  Although Plaintiff does not identify the housekeeper, one can assume he means the custodian or janitor.

claims that "three workers in the lab . . .  will repeatedly interrupt [Plaintiff's] work, and blocked [Plaintiff's] use of laboratory equipment or access to chemicals."  (Id. at ¶ 102.)  Plaintiff alleges that the University staff "spent a huge effort [on] repeated occasions to block the purchase and delivery of . . . needed equipment, in order to delay the work."  (Id. at ¶ 100.)  Plaintiff believes that his co-workers were essentially trying to sabotage his experiments, hinder his projects, and "ruin [his] career."  (Id. at ¶¶ 100, 103-04.)

In addition, Plaintiff witnessed co-workers engaging in what Plaintiff refers to as unsafe experiments in the laboratory.  (Id. at ¶¶ 37-47.)  Plaintiff claims that co-worker Sarah Wong "conducted unsafe mutated viral injections in the main lab" and that as a result he was exposed to neurotoxic material.  (Id. at ¶¶ 37, 39.)  Plaintiff believes that staff intentionally left out harmful bacteria and chemicals near his work station "to annoy" him.  (Id. at ¶ 39.)  "Bio safety hoods were broken" and improperly used for storage.  (Id. at ¶ 40.)  "Yearly internal inspection reports . . . cited the lab for violations of safety rules."  (Id. at ¶ 41.)  Plaintiff claims to have documented these unsafe practices in emails to Penn, but asserts that his concerns were ignored by his supervisors.  (Id. at ¶ 46.)  Nothing was done to correct these safety issues.  (Id. at ¶ 41.)

Plaintiff also complained that Penn staff abused lab mice and wasted grant money.  (Id. at ¶ 82.)  He states that, "Staff and students negligently abandoned laboratory mice, and wasted thousands of dollars (approximately $30,000) . . . with $9,000 wasted in one month alone [sic]."[7] (Id.)

Plaintiff's concerns over his work conditions culminated in 2009 during an incident with co-worker Wong, which ended in Wong calling the police.  Plaintiff and Wong got into an argument.  (Id. at ¶¶ 47-57.)  Just prior to their argument, Plaintiff alleges that Wong

---

[7] It is unclear from the Complaint, however, how the mice were "abandoned."

intentionally broke laboratory equipment to undermine his work.  (Id. at ¶ 47.)  Wong made a derogatory remark about "people like you," which Plaintiff believed referred to his Egyptian citizenship.  (Id. at ¶ 48.)  Plaintiff remained in his personal laboratory room during this incident; however, Wong called the police to resolve the dispute.  (Id. at ¶ 49.)  Plaintiff claims that Wong "called the police falsely on [him] with the aim to betray [sic] me as dangerous[,] deranged and violent middle eastern [sic]."  (Id.)   Plaintiff requested that Penn staff provide him with the police reports, but they refused.  (Id. at ¶ 55.)  Penn did not take any disciplinary action against Wong.  (Id. at ¶¶ 54, 57.)  Following the police incident, Plaintiff's ability to work in the laboratory among his co-workers further deteriorated.  (Id. at ¶ 56.)

Plaintiff alleges that American Postdoctoral Researchers were not subject to the same negative treatment that foreign Postdoctoral Researchers encountered.  (Id. at ¶ 67.)  Specifically, he claims that American Researchers were not "subjected to . . . harassment," were not stalked to find faults in their experiments, and were not forced to do "housekeeping duties."  (Id.)  During separate and unrelated conversations, co-workers made derogatory remarks about Plaintiff's citizenship.  For example, one co-worker told Plaintiff that "people are not educated because they are from middle east [sic]" and that "people like [Plaintiff] end up doing something else, or leaving to their own country."  (Id. at ¶¶ 105, 110.)   Although Plaintiff felt that he was entitled to a position as a resident or assistant professor after working at Penn, he was informed that he would not be awarded either job.  (Id. at ¶ 108.)  He alleges his supervisors informed him that the outcome "would have been different if [Plaintiff] was born and raised here."  (Id.)

Plaintiff believes that Penn has a practice of "exploiting foreign scholars to do complex work on low stipends compensation [sic] without providing them with benefits, or career development plans similar to American graduates."  (Id. at ¶ 112.)  He was informed that another

foreign Postdoctoral Researcher was also treated poorly at work.  (Id. at ¶¶ 52-53.)  Plaintiff states that he "was told by co-workers that they bullied a foreign post-doctoral scholar; he ended up cutting himself and with severe emotional distress and a stroke [sic]."  (Id. at ¶ 53.)  This other alleged instance of harassment convinced Plaintiff that he and other foreign employees were being subjected to negative treatment at the hands of his American supervisors.

Plaintiff further alleges that he informed both Scherer and other supervisors of the various incidents and inappropriate acts of his co-workers.  (Id. at ¶ 66.)  Instead of addressing his concerns, Plaintiff alleges that Scherer did nothing to stop the negative treatment, making it impossible for him to complete his work.  (Id. at ¶¶ 63, 71.)  In fact, Plaintiff claims that Scherer participated in sabotaging Plaintiff's career.  He alleges that Scherer intentionally delayed publication of Plaintiff's work to allow "a group of [Scherer's] collaborates in Germany to do similar experiments to those [Plaintiff] is doing and publish the results prior to [him]."  (Id. at ¶ 82.)  Scherer then informed Plaintiff that because his results were not timely, Plaintiff needed to re-write the grant application to secure the grant's renewal.  (Id. at ¶¶ 83-84.)  Plaintiff initially refused, and told Scherer that he wanted to leave.  (Id. at ¶¶ 83-84, 90.)  However, Plaintiff later completed a new application and the grant was renewed.  (Id. at ¶ 89.)  Scherer acknowledged Plaintiff's contribution to the grant renewal project and thanked him for his work.  (Id. at ¶¶ 90-91.)  Plaintiff then complained that Scherer persuaded him to stay at Penn by assuring Plaintiff that he would receive "training" and "internships" which would further his career development.  (Id. at ¶ 92.)  Plaintiff believed this additional training would help him obtain a position as a resident or assistant professor, however, this never happened.  He was ultimately dismissed on November 30, 2015.  (Id. at ¶ 122.)

On February 11, 2016, Plaintiff initiated this action pro se against the Penn and Federal Defendants in this Court.  (Doc. No. 1.)  He filed an Amended Complaint on April 20, 2016. (Doc. No. 12.)  On May 4, 2016, Defendants filed a Motion to Dismiss the Amended Complaint. (Doc. Nos. 16, 17.)  In response, Plaintiff sought leave to amend the Complaint for a second time by sending in a letter to the Court with his Second Amended Complaint ("SAC") attached.  (Doc. No. 22.)

On June 15, 2016, the Court granted Plaintiff's request and docketed the attached Second Amended Complaint.  (Doc. No. 23.)    On June 27, 2016, Defendants filed two Motions to Dismiss the Second Amended Complaint.  (Doc. Nos. 26-27.)  A hearing on the Motions was held on October 6, 2016.  (Doc. No. 34.)  At the hearing, Plaintiff was afforded another opportunity to amend the Complaint.  (Id.)  On November 21, 2016, Plaintiff filed the Third Amended Complaint ("TAC").  (Doc. No. 38.)  After this filing, the Court denied Defendants' pending Motions to Dismiss the SAC without prejudice as moot.  (Doc. No. 37.)  On December 5, 2016, Defendants filed two Motions to Dismiss the TAC.  (Doc. Nos. 39-40.)  Plaintiff filed a Response in Opposition on January 6, 2017.  (Doc. Nos. 43, 44.)

III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 232 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

When determining a motion to dismiss, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Where, as here, the complaint is filed pro se, the "complaint, 'however inartfully pleaded' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'"  Fatone v. Latini, 780 F.3d 184, 193 (3d Cir. 2015) (quoting Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  It should be dismissed only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of [his] claim that would entitle [him] to relief."  Olaniyi v. Alexa Cab Co., 239 F. App'x 698, 699 (3d Cir. 2007) (citing McDowell v. Del. State Police, 88 F.3d 188, 189 (3d Cir. 1996)).

**IV.    ANALYSIS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants seek to dismiss the TAC in its entirety.  (Doc. Nos. 39, 40.)  Each of Defendants' arguments in opposition to Plaintiff's claims will be addressed in turn.

**A.  Plaintiff Has Not Plausibly Alleged a Claim of Breach of Contract**

In Count I of the TAC, Plaintiff alleges a breach of contract claim against Penn Defendants.  (Doc. No. 38 at ¶¶ 133-41.)  Penn Defendants argue that the breach of contract claim should be dismissed because it is barred by the statute of limitations and it fails to state a claim upon which relief can be granted.  (Doc. No. 39 at 7-10.)  Regarding the latter reason, Penn Defendants assert that Plaintiff has failed to plead plausible facts satisfying the elements of a breach of contract claim.  (Id. at 7.)

**1.    Plaintiff's Breach of Contract Claim is Not Barred
by the Statute of Limitations**

Penn Defendants argue that Plaintiff's contract claim is barred by the statute of limitations.  (Id.)  Under Pennsylvania law, a breach of contract action must be commenced within four years of the alleged breach of the purported contract.[8]  42 Pa. Const. Stat. Ann. §

---

[8] 42 Pa. Const. Stat. Ann. § 5525 states as follows:

(a) General rule.—Except as provided for in subsection (b), the following actions and proceedings must be commenced within four years:

(1) An action upon a contract, under seal or otherwise, for the sale, construction or furnishing of tangible personal property or fixtures.

(2) Any action subject to 13 Pa. Const. Stat. Ann. § 2725 (relating to statute of limitations in contracts for sale).

(3) An action upon an express contract not founded upon an instrument in writing.

5525.  Plaintiff commenced this action by filing a Complaint on February 11, 2016.  (Doc. No. 1.)  Plaintiff's breach of contract claim therefore must be based on an alleged violation of the contract which occurred on or after February 11, 2012.  If the alleged violation occurred before February 11, 2012, then the claim is barred by the statute of limitations.

Plaintiff's contract claim is not barred by the statute of limitations.  First, it is important to identify which contract is controlling in this matter.  Because Plaintiff was employed as a Research Associate from 2011 to 2015, the employment contracts governing this position are the only contracts relevant to this case that are not barred by the statute of limitations.[9]  (Doc. No. 43

---

(4) An action upon a contract implied in law, except an action subject to another limitation specified in this subchapter.

(5) An action upon a judgment or decree of any court of the United States or of any state.

(6) An action upon any official bond of a public official, officer or employee.

(7) An action upon a negotiable or nonnegotiable bond, note or other similar instrument in writing. Where such an instrument is payable upon demand, the time within which an action on it must be commenced shall be computed from the later of either demand or any payment of principal of or interest on the instrument.

(8) An action upon a contract, obligation or liability founded upon a writing not specified in paragraph (7), under seal or otherwise, except an action subject to another limitation specified in this subchapter.

(b) Special provisions.—An action subject to section 8315 (relating to damages in actions for identity theft) must be commenced within four years of the date of the offense or four years from the date of the discovery of the identity theft by the plaintiff.

42 Pa. Const. Stat. Ann. § 5525.

[9]  Plaintiff attached to the TAC his initial employment contract with the University for his Postdoctoral Researcher position.  (Doc. No. 38, Ex. A.)  This contract was for a one-year term.  (Id.)  It was replaced each year by a new one-year contract, the last one expiring on

at 15.)  The Research Associate position was subject to the terms set forth in the offer letter for this position, which Plaintiff signed on October 19, 2011.  (Doc. No. 38, Ex. C.)  The letter states that Plaintiff's position as a Research Associate was for a one-year term, and was subject to renewal on an annual basis, the first of which began on November 1, 2011 and ended on October 31, 2012.[10]  (Id.)  Because Plaintiff alleges that Penn Defendants violated the employment contracts he held throughout his employment, including those in effect after February 12, 2012, his breach of contract claim covering his contracts as a Research Associate is not barred by the statute of limitations.

### 2.   Plaintiff Has Not Plead the Elements of a Breach of Contract Claim

Penn Defendants next argue that Plaintiff has failed to plead the elements of a breach of contract claim.  (Doc. No. 39 at 9.)  In particular, Penn Defendants argue that Plaintiff's breach of contract claim must be dismissed because he has not alleged a specific duty under any contract that was breached.  (Id. at 9-10.)  Plaintiff contends that his employment contract included guarantees of a future job as a resident or assistant professor with the University.  (Doc. No. 38 at ¶¶ 19, 136.)  For reasons that follow, Plaintiff's breach of contract claim will be dismissed.

To state a claim for breach of contract under Pennsylvania law, a plaintiff must allege three things: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages.  Alpart v. General Land Partners, Inc., 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008).  A party claiming breach of contract has the burden of

---

October 31, 2011.  This final contract terminated well before the statute of limitations bar of February 11, 2012.  For these reasons, these contracts cannot be the basis for a valid breach of contract claim.

[10] Although the offer letters for subsequent employment in years 2013, 2014, and 2015 were not provided by the parties, it is presumed that Plaintiff entered in the employment contracts for these years in the same manner which was used for the preliminary Research Associate agreement.

alleging and, ultimately, proving all elements of its cause of action.   Udujih v. City of Philadelphia, 513 F. Supp. 2d 350, 357 (E.D. Pa. 2007).  Penn Defendants argue that the second element of a breach of contract claim—a breach of duty imposed by the contract—was not satisfied.

As previously noted, any alleged breach of contract claim brought by Plaintiff against Penn Defendants is limited to alleged conduct occurring on or after February 11, 2012. Therefore, the only agreement upon which Plaintiff may base his breach of contract claim is the offer letter for the Research Associate position, which he accepted.[11]  (Doc. No. 38, Ex. C.)  The letter states as follows:

> Dear Dr. Wasseff:
>
> On the basis of our recent conversations, I am pleased to offer you the position of Research Associate in the Department of Neurology. I look forward to working together on conducting research on role of gap junctions in the biology of CNS glia in health and in disease.
>
> Your appointment will be effective on November 1, 2011. This appointment will be initially for one (1) year and continuation during that time period and renewal are based on satisfactory performance, availability of funding, and the terms of policies for (insert title: Instructor A, Lecturer A, or Research Associate), as Academic Support Staff, in the Handbook for Faculty and Academic Administrators <http://www.upenn.edu/assocprovost/handbook/ii  b 4.html>.
>
> You will be supported on my grant number 10029126 from the National Multiple Sclerosis Society at an annual rate of $50,418.00, to be paid in accordance with the payroll schedules of the University of Pennsylvania and prorated for the time period worked. This grant will be supplanted by competing renewal of my NIH grant, "The Role of Connexin32 in the Pathogensis of CMTX", which is approved for funding.
>
> As a Research Associate, you will be eligible to enroll in the University's health and welfare insurance programs for you and your eligible dependents. You

---

[11]  The offer letter for the Research Associate position was dated August 29, 2011 and covered a term of employment for one year, beginning on November 1, 2011 and ending on October 31, 2012.  (Doc. No. 38, Ex. C.)  As noted, it was renewed on a yearly basis.

are eligible to participate in the University's supplemental retirement annuity plans which currently include TIAA-CREF and Vanguard. The University does not make a contribution to these plans. If you have any questions about your benefits, you can contact the PENN Benefits Center at 1-888-736-6236 ( 1-888-PENNBEN) or the Retirement Call Center at 1-877-736-6738 (1-877-PENNRET).

As a Research Associate, you will be subject to all applicable University and University of Pennsylvania Health System policies, as they may exist from time to time, including, but not limited to the enclosed policy concerning Penn's Patent and Tangible Research Property <http://www.upenn.edu/almanac/volumes/v51/n22/pdf n22/patent policy.pdf >. Please read, sign and return the Participation Agreement which is enclosed with this offer letter.

This offer is contingent upon your having authorization to work and it is your responsibility to ensure that you are in compliance with U.S. Citizenship and Immigration Services (USCIS) policies. Please contact the University's International Student and Scholar Services (ISSS) office at 215-898-4661 or online at http://www.upenn.edu/oip/iss immediately so that any visa issues may be addressed before you join us. Appointment and payroll documentation cannot be processed until you have presented ISSS approval.

Please sign this offer letter to indicate your acceptance of the terms of your appointment and return it to me by October 1, 2011 with your signed Participation Agreement. I look forward to your coming to the University of Pennsylvania.

(Id.)  Plaintiff signed this offer letter on October 19, 2011, and his employment as a Research Associate became effective on November 1, 2011 for the following year.  (Id.)  The terms set forth in the agreement are clear and unambiguous.  Plaintiff's employment as a Research Associate was initially for a one-year term.  (Id.)  Renewal of his employment contract would be "based on satisfactory performance, availability of funding," and the terms of policies for academic support staff as set forth in the Handbook for Faculty and Academic Administrators. (Id.)  Plaintiff was to receive a salary of $50,418 for this position.  (Id.)  According to the terms of the employment agreement, Penn Defendants had the duty to: (1) allow Plaintiff to work as a Research Associate for one-year, and (2) pay Plaintiff $50,418 in compensation for this work.

Penn Defendants fulfilled both of these obligations.  In fact, Plaintiff's employment agreement as a Research Associate was renewed three times before his employment ended.

Plaintiff alleges, however, that Penn Defendants failed to fulfill their obligations established in the 2006 Handbook entitled "Policies for Postdoctoral Appointments, Training and Education" and that this failure constituted a breach of his employment contract.  (Doc. No. 38, Ex. B.)  Plaintiff contends that "Defendants agreed, among other things, to provide specific and definite services and benefits referenced to in page [sic] 6-24 in the post-doctoral policies." (Doc. No. 38 at ¶ 136.)  In particular, Plaintiff asserts that "as stated in . . . the Penn policies referenced to in the letter, Defendants Penn will provide the following as required in the field, and as provided to other American post-doctoral individuals: internships within Penn as specified in pages 14, 23, including clinical research, internship technology transfer, business planning, establish own laboratory, and obtain assistant professor position [sic]."  (Id. at ¶ 19.)

This argument is unpersuasive for two reasons.  First, this 2006 Handbook entitled "Policies for Postdoctoral Appointments, Training and Education" is not referenced in the controlling employment agreement at issue in this case, the offer letter dated August 29, 2011. (Doc. No. 38, Ex. C.)   It is different from the Handbook for Faculty and Academic Administrators referenced in the offer letter.  (Id.; Doc. No. 39-2, Ex. C.)  This letter contains no reference to the 2006 Handbook with which Plaintiff takes issue.  Second, the alleged obligations on Penn Defendants in the 2006 Handbook are not obligations at all, but are mere suggestions and guidelines for supervisors to assist Postdoctoral Researchers in their career development. (Doc. No. 38, Ex. B.)  The 2006 Handbook does not guarantee that Plaintiff would secure future employment as a resident or assistant professor with the University.  For these reasons, Penn

Defendants breached no duty owed to Plaintiff and his breach of contract claim will be dismissed.

**B. Plaintiff Has Not Plausibly Alleged a Claim of Promissory Estoppel**

In Count II of the TAC, Plaintiff raises a promissory estoppel claim against Penn Defendants. (Doc. No. 38 at ¶¶ 142-49.) Penn Defendants argue that the promissory estoppel claim should be dismissed because it is barred by the statute of limitations and it fails to state a claim upon which relief can be granted. (Doc. No. 39 at 11.) In particular, Penn Defendants assert that Plaintiff has failed to plead plausible facts satisfying the elements of a promissory estoppel claim. (Id. at 12.)

**1. Plaintiff's Promissory Estoppel Claim is Not Barred
by the Statute of Limitations**

Penn Defendants first argue that Plaintiff's promissory estoppel claim is barred by the statute of limitations. (Id. at 11.) Under Pennsylvania law, promissory estoppel claims must be commenced within four years of the alleged breach of the non-contractual promise. See Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000) (holding that the promissory estoppel doctrine "sounds in contract law and . . . like other contract actions, the statute of limitations for a cause of action in promissory estoppel is governed by [42 Pa. Const. Stat. Ann.] § 5525. Therefore, the statute of limitations period . . . is four years."). Like the statute of limitations for the breach of contract claim, Plaintiff's promissory estoppel allegations must have occurred on or after February 11, 2012.

Plaintiff alleges that Scherer made promises about Plaintiff receiving additional training and internships to help his career development. (Doc. No. 38 at ¶ 92.) These assurances appear to have been given sometime after 2010, but the exact date is unclear. Thus, at the motion to dismiss stage of the litigation, accepting all factual allegations as true, and viewing the facts in

the light most favorable to Plaintiff, the promissory estoppel claim will not be barred by the statute of limitations.[12]

### 2.   Plaintiff Has Failed to Plead the Elements of a Claim of Promissory Estoppel

Penn Defendants also argue that Plaintiff has failed to state a claim for promissory estoppel.  (Doc. No. 39 at 12.)  Pennsylvania courts require a plaintiff to prove three elements to make out a claim of promissory estoppel:

> 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.[13]

Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir. 2003) (quoting Crouse, 745 A.2d at 610).

However, "the doctrine of promissory estoppel is only employed to enforce a promise where there has been no consideration[,]" in other words, when there is no binding contract.

Jodek Charitable Trust, R.A. v. Vertical Net Inc., 412 F. Supp. 2d 469, 478 (3d Cir. 2006); see also Constar, Inc. v. Nat'l Distribution Ctrs., Inc., 101 F. Supp. 2d 319, 323 (E.D. Pa. 2000) (holding that promissory estoppel may only be applied when there is no consideration—i.e., no binding contract); Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 416 (3d Cir. 1990)

---

[12] See Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (explaining that, if the statute of limitations bar "is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint" under Federal Rule of Civil Procedure 12(b)(6)).

[13] A plaintiff raising a claim of promissory estoppel bears the burden of establishing all three elements.  Ndubizu v. Drexel Univ., 768 F. Supp. 2d 796, 801 (E.D. Pa. 2011).  First, a plaintiff must base a claim for promissory estoppel on an express promise, rather than a "broad and vague implied promise."  Bull International v. MTD Consumer Group, Inc., 654 F. App'x 80, 100 (3d Cir. 2016) (citing C&K Petroleum Products, Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988)).  Second, a plaintiff must show that he relied on the defendant's promise to his detriment—that is, "in such a manner as to change his position for the worse."  Heckler v. Community Health Servs. of Crawford Cty., Inc., 467 U.S. 51, 59 (1984).  Third, a plaintiff must plead facts showing that injustice can be avoided only be enforcing the promise.  Ndubizu, 768 F. Supp. 2d at 801.

(holding promissory estoppel is unwarranted in light of the district court's finding that the parties formed an enforceable contract); Synesiou v. DesignToMarket, Inc., No. 01-5358, 2002 WL 501494, at *4 (E.D. Pa. Apr. 30, 2002) (stating that "promissory estoppel has no application when parties have entered into an enforceable agreement."); Rho v. Vanguard OB/GYN Assocs., P.C., No. 98-167, 1999 WL 2228993, at *6 (E.D. Pa. Apr. 15, 1999) (finding that when parties have entered into an enforceable contract, relief under promissory estoppel is not warranted).

Here, Plaintiff admits that the parties entered in express contracts for each year of his employment at Penn.  (Doc. No. 38 at ¶ 144.)  He does not claim the contracts are unenforceable. Rather, Plaintiff seeks to enforce these contracts.  As such, this claim fails.

Furthermore, there is another reason why the promissory estoppel claim fails.  Plaintiff has failed to plead plausible facts demonstrating that Defendants made an express promise required under the theory of promissory estoppel.  (Doc. No. 39 at 14-15.)  A plaintiff must base a claim for promissory estoppel on an express promise, rather than a "broad and vague implied promise."  Bull International v. MTD Consumer Group, Inc., 654 F. App'x 80, 100 (3d Cir. 2016) (citing C&K Petroleum Products, Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988)).  Plaintiff can point to no express promise, but rather relies upon the alleged fact that faculty supervisor Steven Scherer told Plaintiff that he would receive "training and internships" which would further his career development.   (Doc. No. 38 at ¶ 92.)   References to "training" and "internships" alone are not explicit promises.  Such "broad and vague implied promise[s]" are insufficient to state a claim for promissory estoppel.  Bull International, 654 F. App'x at 100. Additionally, Plaintiff complains that Penn Defendants made a promise in its Handbook for Faculty and Academic Administrators by stating that: "The University is committed to maintaining an environment that supports the University's mission and promotes learning,

productive employment, and safe experiences for all members of the University community."
(Doc. No. 43 at 16.)  This mission statement, however, contains no express promise made to
Plaintiff.  Therefore, Count II of the TAC alleging promissory estoppel will be dismissed.

### C.  Plaintiff Has Plausibly Alleged a Claim of Race Discrimination Under 42 U.S.C. § 1981, But Has Not Plausibly Alleged a Claim for National Origin Discrimination Under this Statute

In Count III of the TAC, Plaintiff alleges that Penn Defendants intentionally
discriminated against him on the basis of his race and national origin in violation of 42 U.S.C. §
1981 ("Section 1981").  (Doc. No. 38 at ¶¶ 150-53.)  Section 1981 prohibits race discrimination
in the making and enforcement of private contracts.[14]  However, Section 1981 does not prohibit
discrimination based on national origin.  Ladd v. Boeing Co., 463 F. Supp. 2d 516, 524 (3d Cir.

---

[14] 42 U.S.C. § 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right
in every State and Territory to make and enforce contracts, to sue, be parties, give
evidence, and to the full and equal benefit of all laws and proceedings for the
security of persons and property as is enjoyed by white citizens, and shall be
subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the
making, performance, modification, and termination of contracts, and the
enjoyment of all benefits, privileges, terms, and conditions of the contractual
relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by
nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

2006).  Therefore, Plaintiff's claim that Penn Defendants intentionally discriminated against him based on his national origin in violation of Section 1981 will be dismissed.  Plaintiff's allegations of race discrimination pursuant to Section 1981, however, must be assessed.

Section 1981 claims are governed under the same McDonnell Douglas framework as claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII").  Ladd, 463 F. Supp. 2d at 524 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  In the absence of direct evidence of racial discrimination,[15] a plaintiff alleging intentional race discrimination may establish a prima facie case under the McDonnell Douglas framework. Sherrod v. Philadelphia Gas Works, 57 F. App'x 68, 73 (3d Cir. 2003) (citing McDonnell Douglas Corp., 411 U.S. at 802).  To make out a prima facie case, Plaintiff must show that he: "(1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination."[16]  Id.

---

[15] A plaintiff seeking to use direct evidence to show discrimination "faces a high hurdle," and "[d]erogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision makers, do not constitute direct evidence of discrimination."  Tingley-Kelley v. Tr. of Univ. of Pa., 677 F. Supp. 2d 764, 776 (E.D. Pa. 2010) (quotation omitted); see also Villanueva v. Christiana Care Health Servs., Inc., No. 04-258-JJF, 2007 WL 188111, at *4 (D. Del. Jan. 23, 2007) ("While Ms. Collins' remarks may have been insensitive and rude, the Court cannot conclude that they are direct evidence of discrimination.").  Based on the facts in the TAC, the Court cannot conclude that Plaintiff has shown direct evidence of discrimination.

[16] If Plaintiff meets this initial burden of putting forth a prima facie case of discrimination, under the McDonnell Douglas framework, the burden shifts to the defendant to provide evidence of a legitimate non-discriminatory reason for the adverse employment decision.  McDonnell Douglas Corp., 411 U.S. at 802.  Once this burden is met, the plaintiff is responsible for demonstrating that the defendant's rationale for the adverse employment decision was a pretext for discrimination. Id.  Here, Penn Defendants only argue in their Motion to Dismiss that Plaintiff has failed to allege a prima facie case.  They do not argue in the Motion the McDonnell Douglas's burden shifting framework.  Therefore, the Court need not consider it at this stage.

Defendants do not contest that Plaintiff is a member of a protected class and that he was qualified for the positions of Postdoctoral Researcher and Research Associate.  Accordingly, this discussion will focus on the third and fourth elements of the prima facie case analysis.

With regard to the third element—whether Plaintiff suffered an adverse employment action—Plaintiff alleges that the adverse employment action was his dismissal on November 30, 2015.  (Doc. No. 38 at ¶ 122.)  Defendants argue that Plaintiff did not suffer an adverse employment action because Plaintiff's employment contract was for a one-year term, was renewed eight times, and his employment was terminated only because the contracts had expired. (Doc. No. 39 at 15.)

An adverse employment action includes "all tangible employment actions 'such as hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits.'" Sherrod, 57 F. App'x at 73 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Under Section 1981, the decision not to renew an employment contract amounts to an adverse employment action because it affects the terms and conditions of the individual's employment. Fekade v. Lincoln Univ., 167 F. Supp. 2d 731, 739 (E.D. Pa. 2001).

Here, Plaintiff alleges the non-renewal of his employment contract with the University and his subsequent dismissal were adverse employment actions.  (Doc. No. 38 at ¶ 122; Doc. No. 43 at 18.)  Viewing these factual allegations in the TAC as true at the motion to dismiss stage, they are sufficient to establish that Plaintiff has pled facts demonstrating that he suffered an adverse employment action.

Penn Defendants next argue that Plaintiff has not alleged that the adverse employment action (here, failure to renew his contract) occurred because of his membership in a protected class.  (Doc. No. 39 at 15-16.)  Under the fourth element of the prima facie case—whether the

adverse employment action was made under circumstances giving rise to an inference of unlawful discrimination—the relevant inquiry is whether discriminatory animus motivated the employer to take the adverse employment action.  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 412 (3d Cir. 1999).  "The inquiry into the [fourth] element, proof of a causal link, generally focuses on timing and proof of ongoing antagonism."  Burton v. Pa. Bd. of Prob. & Parole, No. 02-2573, 2002 WL 1332808, at *6 (E.D. Pa. June 13, 2002) (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)).

Here, Plaintiff has alleged that on repeated occasions his co-workers and supervisors made derogatory comments based on his race.  For example, Plaintiff alleges that one co-worker told Plaintiff that "people are not educated because they are from middle east [sic]."  (Doc. No. 38 at ¶ 105.)  Plaintiff also alleges that his supervisor, Steven Scherer, told Plaintiff that he did not know what a "ruler" was "because [he is] middle eastern [sic] and not American."  (Id. at ¶ 64.)

Plaintiff claims that his ability to work was severely affected by the attitudes of his co-workers which made it impossible for him to complete his work.  Plaintiff told Scherer and the Vice Deans about various incidents, inappropriate acts, and that "the workplace . . . does not provide equal opportunities to individuals from my backgrounds [sic]."  (Id. at ¶¶ 66, 117-18.)  Furthermore, Plaintiff alleges that Scherer made various discriminatory comments toward him.  (Doc. No. 38 at ¶ 64.)   Though Plaintiff does not specify the temporal relation between Defendants' conduct and his dismissal, the Court infers that they were close in time based on Plaintiff's allegation that he was dismissed after he brought numerous complaints to his supervisors.  (Id. at ¶¶ 114-22; see Burton, 2002 WL 1332808, at *6 (declining to dismiss

discrimination claims even though "the complaint is not a model of clarity and fails to establish a coherent time-line of alleged misconduct").

Given the above analysis, Plaintiff has made out a prima facie case of race discrimination under the McDonnell Douglas framework.  Therefore, the Court will not dismiss Plaintiff's claim of racial discrimination in violation of 42 U.S.C. § 1981.  The Court will, however, dismiss Plaintiff's claim of national origin discrimination because such a claim is not cognizable under Section 1981.

### D. Plaintiff Has Plausibly Alleged a Claim of Race and National Origin Discrimination, and Retaliation Under Title VI

In Count IV of the TAC, Plaintiff raises a claim of race and national origin discrimination, as well as retaliation in violation of Title VI of the Civil Rights Act of 1964 ("Title VI").  (Doc. No. 38 at ¶¶ 154-60.)

Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Under Title VI, a plaintiff must show: (1) that there is racial or national origin discrimination; and (2) that the entity engaging in the discrimination is receiving federal financial assistance.[17]  Ke v. Drexel Univ., No. 11-6708, 2015 WL 5316492, at *12 (E.D. Pa. Sept. 4, 2015).  An allegation of intentional discrimination is required to sustain a Title VI claim.  Alexander v. Sandoval, 532 U.S. 275, 282-83 (2001).

---

[17] In addition, to successfully allege a claim of retaliation, Plaintiff must demonstrate that: (1) he engaged in protected activity, which means that he either opposed an employment practice or filed an EEOC charge; (2) he was subjected to contemporaneous or subsequent adverse action; and (3) there was a causal link between Plaintiff's protected activity and the adverse action.  Moore v. City of Phila., 461 F.3d 331, 341 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

Here, Defendants do not contest that the University of Pennsylvania received federal financial assistance in the form of grants.  Rather, Defendants argue that the first requirement— that there is discrimination on the part of the University—is not satisfied.

Defendants contend that "a Plaintiff stating a claim for Title VI violations against a university must allege violations committed by the university and <u>not</u> by its employees," and that Plaintiff has not met this burden.  (Doc. No. 40 at 17.)  This Court disagrees.  In the TAC, Plaintiff alleges that he brought his concerns to his supervisors and the Vice Deans to alert the University of the treatment he was experiencing.   (Doc. No. 38 at ¶¶ 116-18.)   Plaintiff complains that he "had a meeting with the Vice Dean (Lisa Bellini, MD), in which she directly suggested [Plaintiff] should leave the US.  [Plaintiff] also had another conversation with another Vice dean (Jon Epstein) during which he told [Plaintiff] to file a complaint."   (<u>Id.</u> at ¶ 118.)  Given these facts, Plaintiff has shown that the Dean's office of the University of Pennsylvania was aware of the alleged discrimination, and sanctioned it by not acting to remedy the situation.  In fact, Plaintiff alleges that he was dismissed because of his complaints to the University.  Therefore, Defendants' argument is unavailing.  Plaintiff's allegations under Title VI for race and national origin discrimination, and retaliation will not be dismissed.

### E.  Plaintiff Has Not Plausibly Alleged a Claim for Breach of Fiduciary Duty

In Count V of the TAC, Plaintiff alleges that Penn Defendants breached their fiduciary duty owed to Plaintiff.  (Doc. No. 38 at ¶¶ 161-65.)  To the contrary, Penn Defendants argue that, in this employer-employee context, no fiduciary duty was owed to Plaintiff.  (Doc. No. 39 at 19.)  The Court agrees with Penn Defendants.

A fiduciary relationship exists where there is a "special relationship" between the parties, which involves confidentiality, special trust, or fiduciary responsibilities.   <u>Seifert v. Prudential</u>

Ins. Co. of Am., No. 13-7637, 2014 WL 2766546, at *7 (E.D. Pa. June 18, 2014).  "A fiduciary relationship does not arise merely because one party relies on and pays for a specialized skill or expertise of another party."  Id. (citing eToll, Inc. v. Elias/Savion Advert., Inc., 811 A.2d 10, 13 (Pa. Super. Ct. 2002)).  In an employment context, "An employer-employee relationship does not, in and of itself, give rise to a fiduciary relationship."  United States v. Kensington Hosp., 760 F. Supp. 1120, 1133 (E.D. Pa. 1991).  For example, in Diaz v. Rent-a-Center Inc., the district court stated that "[a]lthough state courts have recognized a 'confidential relationship,' requiring one party to act with the utmost good faith for the benefit of the other party in the areas of fiduciaries and estates, we find no precedent to extend this protection to [the] employer/employee relationship."  No. 03-3763, 2004 WL 241505, at *3 (E.D. Pa. Feb. 6, 2004) (citations omitted).

Here, Plaintiff alleges that Penn Defendants breach their fiduciary duty owed to him by "denying the benefits stated in post-doctoral policies."  (Doc. No. 38 at ¶ 163.)  This allegation is merely another way of stating that Penn Defendants breached duties owed to Plaintiff arising solely out of the employer-employee relationship.  He alleges no special relationship between the parties that would involve confidentiality, special trust, or fiduciary responsibility.  Seifert, 2014 WL 2766546, at *7.  Therefore, Plaintiff's breach of fiduciary duty claim will be dismissed.[18]

---

[18] Plaintiff also alleges that Penn Defendants admitted that they owed a fiduciary duty to Plaintiff based on the University Handbook entitled "Policies for Postdoctoral Appointments, Training, and Education."  (Doc. No. 43 at 25.)  Plaintiff relies on the following statement in the University Handbook: "Obtaining permanent positions can be fiercely competitive and as an educational institution we must ensure that our postdocs are appropriately prepared."  (Id. citing Doc. No. 38, Ex. B at 15.)  This statement, however, is part of a summary of the postdoctoral program, and does not create any duty on the part of Penn Defendants.  Reliance on it is unpersuasive.

**F. Plaintiff Has Plausibly Alleged a Claim for Negligent Supervision**

In Count VI of the TAC, Plaintiff raises a negligent supervision claim against Penn Defendants.  (Doc. No. 38 at ¶¶ 166-72.)  Penn Defendants argue that the negligent supervision claim should be dismissed because it is barred by the statute of limitations and it fails to state a claim upon which relief can be granted.  (Doc. No. 39 at 21.)  Penn Defendants assert that Plaintiff has failed to plead plausible facts satisfying the elements of a negligent supervision claim.  (Id. at 22.)

### 1. Plaintiff's Negligent Supervision Claim is Not Barred by the Statute of Limitations

Penn Defendants first argue that Plaintiff's negligent supervision claim is barred by the statute of limitations.  (Id. at 21.)  Under Pennsylvania law, a negligent supervision claim must be initiated within two years of the alleged violative conduct.  See 42 Pa. Const. Stat. Ann. § 5524 (establishing that "the following actions and proceedings must be commenced within two years . . . (2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another"); see also Ormsby v. Luzerne Cty. Dept. of Public Welfare Office of Human Servs., 149 F. App'x 60, 62 (3d Cir. 2005) (noting that "claims for negligent supervision and intentional infliction of emotional distress brought in Pennsylvania are also governed by this two year limitations period.").

Plaintiff initiated this action on February 11, 2016.  Given the two-year statute of limitations, Plaintiff must allege violative conduct that occurred on or after February 11, 2014 to state a claim for negligent supervision.  In Count VI of the TAC, Plaintiff alleges that Penn Defendants failed to supervise its staff to ensure compliance with laboratory safety rules and to prevent unlawful discrimination against foreign employees.  (Doc. No. 38 at ¶¶ 166-72.)

Plaintiff does not set forth the exact dates of the occurrence on which Defendants failed to supervise staff.  However, when viewing the facts in the light most favorable to Plaintiff, it appears that he alleges this violative conduct continued up until he was dismissed on November 30, 2015, well after the statutory bar of February 11, 2014.  Therefore, Plaintiff's negligent supervision claim will not be dismissed for violating the statute of limitations.

### 2.   Plaintiff Has Plausibly Plead the Elements of Negligent Supervision

Penn Defendants argue that Plaintiff has failed to plead the elements of a negligent supervision claim.  (Doc. No. 39 at 22.)

To recover for negligent supervision under Pennsylvania law, "a plaintiff must prove that his loss resulted from (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee."  Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 488 (3d Cir. 2013).

To meet this burden, Plaintiff alleges that Penn Defendants were negligent in their supervision of staff in two ways.  First, Plaintiff contends that Defendants failed to properly supervise employees to prevent unlawful discrimination.  (Doc. No. 38 at ¶¶ 167-69.)  Second, Plaintiff alleges that Defendants failed to ensure employees followed laboratory safety rules.  (Id. at ¶¶ 37-41.)

Regarding the first contention, Penn Defendants assert that the negligent supervision claim is nothing more than a recitation of the Section 1981 and Title VI claims, and therefore should be dismissed as superfluous.  (Doc. No. 39 at 24-25.)  This argument, however, is unpersuasive.  It does not address whether Plaintiff has pled facts that, when taken as true, show the elements of a negligent supervision claim.

When reviewing the TAC, it appears that Plaintiff has pled facts satisfying the elements of a negligent supervision claim.  First, Plaintiff alleges that he notified his supervisors and the Vice Deans of the negative comments co-workers were saying to him, which were outside the scope of their employment.  (Doc. No. 38 at ¶¶ 116-18.)  The superiors failed to act to prevent further negative treatment.  (Id.)  Second, Plaintiff alleges that all negative actions taken against him occurred on University premises in the laboratory.  (Id. at ¶¶ 45-57.)  Third, Plaintiff alleges that the University was notified of the actions of his co-workers, but failed to take any disciplinary action against them.  (Id. at ¶¶ 116-18.)  Given these allegations, Plaintiff has plausibly alleged a prima facie case of negligent supervision against Penn Defendants for their failure to prevent unlawful discrimination.

Regarding Plaintiff's assertion that Penn Defendants failed to supervise staff to ensure compliance with safety standards in the laboratory, Plaintiff has pled sufficient facts regarding this failure to survive a motion to dismiss.  For this claim to survive a motion to dismiss, Plaintiff must first plead facts showing that employees failed "to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment."  Belmont, 708 F.3d at 488.  Here, Plaintiff alleges that staff intentionally left out harmful bacteria and chemicals "to annoy" him.  (Doc. No. 38 at ¶ 40.)  Second, Plaintiff has shown that these acts were committed in the University's laboratory.  Third, Plaintiff has demonstrated that Penn Defendants were alerted to the safety violations because yearly inspections reports cited the laboratory for safety violations.  (Id. at ¶¶ 37-41.)  Plaintiff also claims that he emailed his supervisors about the safety issues. (Id. at ¶ 46.)  According to Plaintiff, supervisors could have controlled his co-workers to prevent the safety violations, but they failed to do so.  Thus, Plaintiff's negligent supervision claim will not be dismissed.

**G. Plaintiff Has Not Plausibly Alleged a Violation of the Administrative Procedures Act**

In Count VII of the TAC, Plaintiff asserts a claim under the Administrative Procedure Act ("APA") against the National Institute of Health ("NIH") and the Department of Health and Human Services ("HHS"), who are referred to here as Federal Defendants. (Id. at ¶¶ 173-84.) Plaintiff essentially argues that Federal Defendants should be held vicariously liable for the alleged workplace discrimination Plaintiff experienced at his former employer, the University of Pennsylvania, because Plaintiff worked on NIH and HHS funded grant projects while employed by Penn. (Doc. No. 40 at 2, 4; Doc. No. 44 at 2-8.)

Federal Defendants argue that Count VII should be dismissed for two reasons. (Id. at 1-2.) First, Federal Defendants maintain that any decision to investigate allegations of workplace discrimination constitutes discretionary action exempt from APA review. (Id. at 6.) Second, Federal Defendants argue that Plaintiff's ability to seek relief against Penn Defendants under federal anti-discrimination statutes precludes APA review. For reasons that follow, this Court agrees with the argument of Federal Defendants.

First, Federal Defendants assert that any decision to investigate allegations of workplace discrimination constitutes discretionary action exempt from APA review. (Id.) The Administrative Procedure Act ("APA") establishes the way in which federal administrative agencies propose and establish regulations. In addition, the APA establishes a framework that permits courts to review agency actions.[19] 5 U.S.C. § 702. As the Third Circuit explained in

---

[19] The APA states as follows:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or

American Disabled for Attendant Programs Today v. United States Dept. of Housing and Urban

Dev.:

> The APA . . . waives federal sovereign immunity in certain circumstances to allow equitable relief from agency action or inaction. *See* 5 U.S.C. § 702. If review is allowed, a court may "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action" that is determined to be "arbitrary, capricious, an abuse of discretion," or "short of statutory right." *Id.* § 706. The APA allows judicial review of agency actions unless the "(1) statute[ ] preclude[s] judicial review; or (2) [the] agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Whether an agency action falls under prong (2) and is "committed to agency discretion by law" is determined by a "construction of the substantive statute involved to determine whether Congress intended to preclude judicial review of certain decisions." *Heckler v. Chaney,* 470 U.S. 821, 828–29 (1985).
>
> Agency actions are typically presumed to be reviewable under the APA. Importantly however, the Supreme Court has established a presumption *against* judicial review of agency decisions that involve whether to undertake investigative or enforcement actions. *See Chaney,* 470 U.S. at 838. Noting that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," the Court stated that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. This presumption of enforcement decision unreviewability may be rebutted, however, "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33. Thus, we may review HUD's enforcement decisions only if Congress has granted us power to review by providing us with guidelines or "law to apply."

---

employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702.

170 F.3d 381, 383-84 (3d Cir. 1999).  The APA generally does not provide an avenue for judicial relief for discretionary acts or omissions of an agency.  See Asemani v. I.R.S., 163 F. App'x 102, 104 (3d Cir. 2006) (holding that the pro se plaintiff could not seek judicial review of the discretionary decision of the I.R.S.); see also Elhaouat v. Mueller, No. 07-632, 2007 WL 2332488, at *3, 15 (E.D. Pa. Aug. 9, 2007) (finding that the plaintiff could not obtain judicial relief from the United States Citizen and Immigration Services' discretionary decision to delay the naturalization of the plaintiff).  However, the APA's general presumption of unreviewability may be rebutted by a statutory policy directing the agency to act.  Therefore, we must look to a plaintiff's allegations to determine what substantive statutes, if any, require the agency to act.

Here, Plaintiff alleges that three statutes required Federal Defendants to intervene or investigate his workplace discrimination dispute with Penn Defendants.  (Doc. No. 38 at ¶¶ 173-84.)  Those statutes are 42 U.S.C. § 241, 42 U.S.C. § 293, and 18 U.S.C. § 242.  (Id. at ¶¶ 174-79.)

Plaintiff first alleges that 42 U.S.C. § 241 required Federal Defendants to take action to prevent the discrimination Plaintiff experienced at Penn.  (Id. at ¶¶ 174, 178.)  42 U.S.C. § 241 states, in part:

> The Secretary [of Health and Human Services] shall conduct in the Service, and encourage, cooperate with, and render assistance to other appropriate public authorities, scientific institutions, and scientists in the conduct of, and promote the coordination of, research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments of man . . . .

42 U.S.C. § 241(a).  This statute contains the general authority under which grants are awarded.  This subsection indicates that the Secretary of HHS should cooperate with and render assistance to scientific institutions, such as the University of Pennsylvania.  This statute does not require Federal Defendants to enforce anti-discrimination measures in a private workplace.  In fact, the

statute does not address any required action on the part of Federal Defendants to prevent private workplace disputes.  Any proscribed action under this statute is discretionary.  Therefore, this statute cannot provide a means of obtaining judicial review here.

Next, Plaintiff contends that 42 U.S.C. § 293 required Federal Defendants to take action to prevent the discrimination Plaintiff experienced at Penn.  (Doc. No. 38 at ¶¶ 175, 177-78.)  42 U.S.C. § 293 provides in part:

(a) In general

The Secretary [of Health and Human Services] shall make grants to, and enter into contracts with, designated health professions schools described in subsection (c) of this section, and other public and nonprofit health or educational entities, for the purpose of assisting the schools in supporting programs of excellence in health professions education for under-represented minority individuals.

(b) Required use of funds

The Secretary may not make a grant under subsection (a) of this section unless the designated health professions school involved agrees, subject to subsection (c)(1)(C) of this section, to expend the grant—

(1) to develop a large competitive applicant pool through linkages with institutions of higher education, local school districts, and other community-based entities and establish an education pipeline for health professions careers;

(2) to establish, strengthen, or expand programs to enhance the academic performance of under-represented minority students attending the school;

(3) to improve the capacity of such school to train, recruit, and retain under-represented minority faculty including the payment of such stipends and fellowships as the Secretary may determine appropriate;

(4) to carry out activities to improve the information resources, clinical education, curricula and cultural competence of the graduates of the school, as it relates to minority health issues;

(5) to facilitate faculty and student research on health issues particularly affecting under-represented minority groups, including research on issues relating to the delivery of health care;

(6) to carry out a program to train students of the school in providing health services to a significant number of under-represented minority individuals through training provided to such students at community-based health facilities that—

(A) provide such health services; and

(B) are located at a site remote from the main site of the teaching facilities of the school; and

(7) to provide stipends as the Secretary determines appropriate, in amounts as the Secretary determines appropriate.

(c) Centers of excellence

(1) Designated schools

(A) In general

The designated health professions schools referred to in subsection (a) of this section are such schools that meet each of the conditions specified in subparagraphs (B) and (C), and that—

(i) meet each of the conditions specified in paragraph (2)(A);

(ii) meet each of the conditions specified in paragraph (3);

(iii) meet each of the conditions specified in paragraph (4); or

(iv) meet each of the conditions specified in paragraph (5).

(B) General conditions

The conditions specified in this subparagraph are that a designated health professions school—

(i) has a significant number of under-represented minority individuals enrolled in the school, including individuals accepted for enrollment in the school;

(ii) has been effective in assisting under-represented minority students of the school to complete the program of education and receive the degree involved;

(iii) has been effective in recruiting under-represented minority individuals to enroll in and graduate from the school, including providing scholarships and other financial assistance to such individuals and encouraging under-represented minority students from all levels of the educational pipeline to pursue health professions careers; and

(iv) has made significant recruitment efforts to increase the number of under-represented minority individuals serving in faculty or administrative positions at the school.

(C) Consortium

The condition specified in this subparagraph is that, in accordance with subsection (e)(1) of this section, the designated health profession school involved has with other health profession schools (designated or otherwise) formed a consortium to carry out the purposes described in subsection (b) of this section at the schools of the consortium.

(D) Application of criteria to other programs

In the case of any criteria established by the Secretary for purposes of determining whether schools meet the conditions described in subparagraph (B), this section may not, with respect to racial and ethnic minorities, be construed to authorize, require, or prohibit the use of such criteria in any program other than the program established in this section.

42 U.S.C. § 293.  Section 293 describes "centers of excellence," and sets guidelines for an institution to achieve this designation.  Id.  Like Section 241, this statute does not require Federal Defendants to intervene in, investigate, or otherwise enforce anti-discrimination measures in a private workplace.  Therefore, this statute cannot be the basis for Plaintiff's claim against Federal Defendants.

Last, Plaintiff claims that 18 U.S.C. § 242 required Federal Defendants to take action to prevent the discrimination Plaintiff experienced at work.  (Doc. No. 38 at ¶ 176.)  18 U.S.C. § 242 is a criminal statute.  It provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 242.  It is not clear what relevance, if any, this criminal statute has with respect to Plaintiff's civil grievances.  It is clear, however, that this statute does not require Federal Defendants to investigate and address Plaintiff's discrimination complaints.  In addition, it is established that private citizens do not enjoy a private right of action under 18 U.S.C. § 242. Cito v. Bridgewater Twp. Police Dept., 892 F.2d 23, 26 n.3 (3d Cir. 1989).  Therefore, this statute does not allow Plaintiff to bring this claim against Federal Defendants.

In sum, Plaintiff claims three statutes required Federal Defendants to investigate his discrimination complaints.  None of these statutes, however, require any such action on the part of Federal Defendants.  Therefore, Plaintiff's claim against Federal Defendants pursuant to the APA will be dismissed.

Second, Federal Defendants argue that Plaintiff's ability to seek relief against Penn Defendants under federal anti-discrimination statutes such as 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964 precludes APA review.  (Doc. No. 40 at 6.)  Agency action is reviewable only when there is no other legal remedy.[20]  5 U.S.C. § 704.  Section 1981, Title VI,

---

[20] 5 U.S.C. § 704 provides:

and other federal anti-discrimination statutes are the authority through which employment discrimination claims are litigated.  A plaintiff cannot raise a claim pursuant to the APA when he has a legal remedy through Section 1981 and Title VI.  Here, Plaintiff may use these claims to seek legal redress for the discrimination he endured at work.  In fact, Plaintiff has asserted these claims in the TAC.  Theses avenues for relief precludes any APA claim against Federal Defendants.  For this reason, Plaintiff's APA claim will be dismissed.

In conclusion, Plaintiff's APA claim will be dismissed for two reasons.  First, this claim must be dismissed because Federal Defendants' decision not to investigate allegations of discrimination constitutes discretionary action that is exempt from APA review.  Second, this claim must be dismissed because Plaintiff's ability to seek relief from his employer under federal anti-discrimination statutes precludes APA review.

## V.      CONCLUSION

For the foregoing reasons, Penn Defendants' Motion to Dismiss (Doc. No. 39) will be granted in part and denied in part.  Plaintiff's breach of contract claim in Count I of the TAC, promissory estoppel claim in Count II, and breach of fiduciary duty claim in Count V each will be dismissed.  However, Plaintiff's Section 1981 claim in Count III of the TAC, Title VI claim in Count IV, and negligent supervision claim in Count VI will not be dismissed.

---

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.  Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

5 U.S.C. § 704.

In addition, Federal Defendants' Motion to Dismiss (Doc. No. 40) will be granted in its entirety and they will be dismissed as Defendants in this case.  An appropriate Order follows.